## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **SCOTT WILLIAM MARSTON,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **Civil Action No.: 24-cv-00129-KD-B** |
| | ) |
| **BELLSOUTH COMMUNICATIONS, LLC,** | ) |
| **Defendant.** | ) |

### <u>ORDER</u>

This action is before the Court on the Motion for Summary Judgment, filed by Defendant Bellsouth Communications, LLC ("Bellsouth"). (Doc. 49). Upon consideration, and for the reasons below, the motion is **GRANTED**.

### I.     Findings of Fact[1]

Plaintiff Scott Marston ("Marston") suffers from Tourette syndrome, a disability that causes him to have involuntary "tics." (Doc. 50-1 at 10). Marston's tics include tapping his teeth and thighs, squinting his eyes, spinning in a circle, burning his hand with a cigarette, and cursing. (<u>Id.</u> at 23). When Marston's tics become aggravated, he struggles with tasks like driving, communicating, running equipment, and focusing. (<u>Id.</u> at 22–23).

### 1.     Bellsouth hires Marston

Marston applied to work at Bellsouth as a machine operator. (Doc. 50-1 at 10). Marston experienced a tic during his interview, which prompted him to disclose his Tourette syndrome to an interviewer (Tim Patterson). (<u>Id.</u>). Bellsouth hired Marston as a machine operator on April 7, 2021. His duties involved operating company vehicles and equipment, placing buried service wires

---

[1] The "facts," as accepted at the summary judgment stage, "may not be the actual facts of the case." <u>Feliciano v. City of Miami Beach</u>, 707 F.3d 1244, 1247 (11th Cir. 2013).

using boring machines or manual tools, meeting with customers, and following established safety practices and procedures. (Doc. 50-1 at 12; Doc. 50-2 at 2).

Bellsouth supervisors completed safety checks for employees once a month by coming to their job site. (Doc. 50-1 at 30). Marston received Bellsouth's Code of Business Conduct every year of his employment. (Doc. 50-3; Doc. 50-4). Marston does not dispute that he received ethics and harassment training "from time to time" and that he was familiar with the company's Equal Employment Opportunity ("EEO") and Harassment Policies. (Doc. 50-1 at 15, 35; Doc. 50-5). Bellsouth's policies provided multiple ways to report complaints and informed employees that they have the right to file discrimination charges. (Doc. 50-5).

### 2. Marston has issues with his new supervisor—Bryan Lyons

For around six months, Tim Patterson ("Patterson") was Marston's direct supervisor. (Doc. 50-1 at 16). Marston had no concerns with his employment during this time. (Id.). Marston's next supervisor was Bryan Lyons ("Lyons"). (Id.). Lyons was aware of Marston's disability because Patterson and Marston explained it to Lyons. (Doc. 30-1 at 2). Marston believed that Lyons was "trying to get rid of [him] or that [Lyons] was trying to find something that [he] was doing wrong." (Doc. 50-1 at 16). This belief was based on "[w]rite-ups, things [Lyons] would say, taking [Marston's] machine away from [him], [and Lyons] lying in the union meeting." (Id.).

Marston was written up for an incident on April 18, 2022, where he was "hand digging a trench without [his] gloves, and [he] didn't have a vest on." (Id. at 17).[2] On a separate occasion, Marston told Lyons that his tics were bugging him, and Lyons smiled and responded: "Learn to play the game." (Doc. 50-1 at 17). Another time, Marston reported a machine issue to Lyons, and

---

[2] Marston "believe[s]" this specific write-up led to him filing a union grievance, which resulted in Lyons claiming that Marston "called him from a duck blind" to say that he could not come in to work. (Doc. 50-1 at 16–17). Marston denies that he ever called Lyons while on a hunting trip. (Id.).

2

Lyons responded: "What did you hit?" and would not believe Marston when he said that he did not hit anything. (Id.).

On April 20, 2022, Marston's tics were "out of control" and he took a vacation day. (Doc. 50-1 at 22).[3] Lyons wrote Marston up for not pre-requesting the vacation time. (Doc. 55-1). According to the write-up, Lyons received a text from Marston on the morning of April 20 "stating that he was going to burn a vacation day," and Lyons replied, "no you need to report, you should have put the day in ease." (Id.). The write-up also explained that "[a] crew meeting was held in April that covered vacations would not be approved due to work demand unless it was pre-scheduled through ease." (Id.).

### 3.  Marston takes FMLA leave

In April 2022, Marston requested Family and Medical Leave Act ("FMLA") leave because of the severity of his tics. (Doc. 50-7). Two days later, Bellsouth approved continuous leave for April 22, 2022 to July 14, 2022. (Id.). Marston learned about FMLA leave from the union president. (Doc. 50-1 at 25). The union president talked to Lyons about FMLA leave, which led to Lyons requesting Marston to get on FMLA. (Id.). Lyons advised Marston to take FMLA leave after Marston told him that he needed to miss work because his tics were getting bad. (Doc. 50-6 at 12).

### 4.  Marston returns from FMLA leave

On June 20, 2022, before his leave ended, Marston returned to work in the same position and rate of pay. (Doc. 50-1 at 25; Doc. 50-8). Lyons commented about Marston using FMLA leave, stating that Marston was "out a lot." (Doc. 50-1 at 68). Marston received write-ups from Lyons.

---

[3] Marston recalls being told he could take a vacation day, but the cited portion of Marston's testimony does not describe who told him this. (Doc. 50-1 at 22). The cited portion also does not show that Marston asked for the day off because of his tics. (Id.). Lyons disputes that Marston told him that he was going to take a day off because of his tics. (Doc. 50-6 at 11).

(Id.). Marston's ditch-digging machine— a "Zahn," which made his job "a lot easier"—was gone when he returned to work. (Id. at 18). Marston asked Lyons where the Zahn was and when he would get it back, and Lyons told him that it was gone. (Id.).

During this time, two of Marston's co-workers at his work site had a Zahn. (Doc. 50-1 at 19). Both co-workers worked at Bellsouth longer than Marston. (Id.). Marston—and at least one other co-worker—had to work with a "[b]ig, bulky machine" that they had to walk behind. (Id.). Marston was told by someone that the Zahn had to be fixed. (Id.).

### 5. Tray Finlay becomes Marston's supervisor

Around July of 2022, Tray Finlay ("Finlay") replaced Lyons as Marston's direct supervisor. (Doc. 50-10 at 6).[4] Finlay visited Marston's work site in Daphne at least once a month for the required safety visits. (Id. at 8). Finlay suspended Marston for failing to wear his safety glasses on January 10, 2023. (Doc. 50-11 at 11). Multiple times prior to this suspension, Finlay observed Marston working without safety glasses and coached Marston on the problem. (Id. at 2, 5, 12). Marston does not dispute that he was not wearing his safety glasses properly on this date or that Finlay wrote up other employees "sometimes." (Doc. 50-1 at 69). However, Marston recalls that the safety glasses were on his head, that another co-worker —Trevor Baker ("Baker")—was not wearing any safety equipment except his glasses, and that Baker was not disciplined. (Id. at 32).

Marston asserts that Finlay assigned him more difficult jobs, like bores. (Doc. 50-1 at 67). Marston admits that Bellsouth and Finlay gave workers with seniority the easiest jobs. (Id. at 68). Marston also received a Zahn machine while Finlay was his supervisor. (Id. at 18). Marston recalls receiving a Zahn after asking Finlay about the Zahns in the Mobile yard. (Id.). Finlay does not

---

[4] Although Finlay's deposition lists his last name as "Findlay," the business records of Bellsouth show that his last name is "Finlay." (Doc. 50-12 at 16; Doc. 50-14 at 4).

recall Marston ever asking him to get a Zahn back. (Doc. 50-10 at 18). According to Finlay, the Zahn machine was the only bore that Marston had while working under Finlay. (Id.). Finlay also testified that neither the Zahn nor the machine Marston used as a replacement are easy to use. (Id.).

### 6. Marston's co-workers report him to HR

In the summer of 2023, Finlay visited Marston's yard while Marston was on FMLA leave. Marston's co-workers complained about Marston not being there. (Doc. 50-10 at 12). Finlay remembers telling them: "Scott has FMLA." (Id.). "Y'all were all wanting me to discipline him over something that is legal, like and its excused." (Id.). "He's got a real issue, . . . You understand the issue." (Id.). "He doesn't get paid for the day." (Id.). Marston's co-workers then stated that Marston "would call them in the field and basically brag about being home." (Id.).

After this conversation, Finlay turned around and saw dents in a work-truck door. (Id.). Marston's co-workers blamed the dents on Marston, saying that Marston banged the door against a mirror while "horse playing" with another co-worker. (Id. at 13). Marston's co-workers then claimed that Marston was vulgar at the yard, including that Marston "was going around grabbing people [on] the leg, saying he was going to fuck them in the ass" and that Marston told a co-worker that they could "go in the bathroom and figure it out." (Id. at 13–14). Finlay told them to report the complaints to HR because the alleged behavior was against Bellsouth policy. (Id. at 12).

On May 4, 2023, Bellsouth received complaints from two of Marston's co-workers—Baker and Danny Sullivan ("Sullivan")—through Bellsouth's Ethics hotline. (Doc. 50-12). Baker's complaint alleged that Marston frequently made remarks about "fucking people in the ass" and made demeaning comments about the weight and appearance of others. (Id. at 12). Sullivan's complaint alleged that Marston "continuously made vulgar sexual gestures at work and sexually

explicit comments" and that Marston's behavior is "intolerable and makes everyone feel uncomfortable." (Id. at 21).

Thomas Rutledge investigated the claims and issued an EEO Investigation report. (Doc. 50-12 at 23). Rutledge interviewed several of Marston's co-workers. Baker and Sullivan explained their concerns about Marston's inappropriate language and sexual gestures, including humping motions and touching co-workers' nipples. (Id. at 3, 9). Baker reported that Marston "throws around the 'N' word," always says "I'll kick your ass," and remarks that he is going to hit or lick his co-workers' sphincters. (Id. at 9). Baker also reported that Marston made moaning noises and told Baker that he was at Baker's wife's house and "was balls deep." (Id.).

Rutledge interviewed Marston on June 2, 2023. (Id. at 6). Marston denied using the "N" word,[5] but "did not deny the sexual comments, gestures, topics, etc." (Id. at 6–7, 16). Marston explained to Rutledge that he has Tourette syndrome, that his co-workers say the same stuff, that his co-workers call him a "piece of shit who doesn't show up for work," and that his co-workers—specifically "all of them"—call him retarded and say that he would be fired if he was not retarded. (Id. at 6). Marston admitted to Rutledge that he had never reported his co-workers' comments and explained that he went directly to them if he had a problem. (Id.). Marston admitted to telling his co-workers that he would stick something up their butt, but Marston explained that he said this in response to his co-workers giving him a hard time for not coming to work. (Id. at 7).

In response, Rutledge investigated Marston's allegations. (Doc. 50-12 at 16). On June 8, 2023, Rutledge spoke to Baker. (Id.). Baker stated that he had not heard anyone call Marston a retard. (Id.). Baker clarified that he told Marston that he "was acting" retarded but not that he "was"

---

[5] Later, Marston admitted to "possibly" saying the "N" word at work in response to his co-workers saying it: "I threw it back on a couple of them and said, y'all are the niggers." (Doc. 50-1 at 70).

retarded. (Id. at 10). Baker stated that he and his co-workers were frustrated with Marston's work attendance because the absences were "screwing [them] over." (Id.). Rutledge also spoke to Sullivan, and Sullivan stated that he has not heard anyone call Marston retarded or witnessed anyone giving Marston a hard time for taking off work. (Id. at 4, 16).

Rutledge concluded his investigation after speaking with Finlay and Bellsouth HR officials. (Doc. 50-12 at 16). The HR officials agreed with Rutledge's recommendation of coaching for everyone involved in the case. (Id.). They also requested that Rutledge conduct management training. (Id.). Marston later described the EEO training as stupid in the "way that management is trying to kind of back up and . . . act like they're preventing everything." (Doc. 50-1 at 64).

### 7. Marston reports his co-workers to Rutledge

On June 8, 2023, during the investigation into complaints against Marston, Marston called Rutledge to report an incident from a year-and-a-half prior. (Doc. 50-12 at 16). Marston told Rutledge that Baker shoved him against a vehicle and put his hands on Marston's neck in late 2021 or January 2022. (Id.). Marston explained that the incident was not reported, but there were witnesses. (Id.). Marston told Rutledge that his co-workers: "throw [him] around every morning," "throw [him] on the ground," "put [him] in a headlock," "one bruised a rib," "put [him] in a trash can," "throw [him] in the back of [his] truck." (Doc. 50-1 at 40).

On June 12, 2023, Rutledge submitted a case to Bellsouth's Asset Protection ("AP") division to investigate Marston's assault allegations. (Doc. 50-12 at 16). The AP investigation into Marston's assault allegation was assigned to Slyvia Bedgood ("Bedgood"). (Doc. 50-14 at 3). On August 1, 2023, Bedgood spoke with Finlay. (Id. at 4). Finlay explained that he was not the manager at the time of the alleged choking incident and only became aware through the EEO investigation. (Id.).

On August 7, 2023, Bedgood met with Marston in the presence of Finlay. (Id.). Marston told Bedgood that, on the day of the incident, Baker called him a "fucking retard" that "probably never had any pussy," and that he responded to Baker by saying, "that's not true, I was balls deep in your wife last night." (Id.). Marston reported that Baker got out of his truck, ran up to him, and began choking him. Marston also reported that his co-workers called him a "fucking retard" every time he uses FMLA leave and that Baker had told Marston that it sounds like he is "choking on a dick" when he was having a tic. (Id.). Marston advised Bedgood that he did not go to management about the issue because he is "not that type of guy." (Id.). Marston explained that he decided to report the incident because his co-workers reported him. (Id.). Marston also recorded the meeting with Bedgood and discussed the transcript of the recording during his deposition. According to both the transcript and Marston's deposition, Marston reported that he does not "go running to HR for every little problem." (Doc. 50-1 at 40; Doc. 50-15 at 44). Marston also told Bedgood that his co-workers stopped harassing him after they called HR: "They quit all that shit. When they called HR, all that stopped." (Doc. 50-1 at 39; Doc. 50-15 at 42).

Bedgood also interviewed Joseph Cornwell, Baker, Sullivan, and Lyons about the choking incident. (Doc. 50-14). Cornwell recalled Marston saying something about Baker's wife before the incident. (Id. at 5). Cornwell did not recall ever hearing Baker say anything about Marston's disability. (Id.). Baker admitted to grabbing Marston by the neck after Marston made vulgar comments about his wife. (Id. at 3). Marston admits that he responded to Baker by "slapp[ing] the hell out of him." (Doc. 50-1 at 38).

Baker and Sullivan also reported that Marston had told them: "I will bend you over that stall door and you will take it and like it!" (Doc. 50-14 at 5, 7). Lyons stated that he had no

knowledge of the choking incident and that Marston never told him about others giving him a hard time about using FMLA. (Id. at 8).

During the AP investigation, Finlay and Marston had a grievance meeting involving an earlier suspension. (Doc. 50-16). Marston accused Finlay of "coming after him," and Finlay advised Marston to go to Ethics if he believed that. (Id. at 2). Finlay's comments from the coaching discussion explained that Marston "gets frustrated and uses language at times and [Finlay's] fear is that will land him in a bad spot one day." (Id.). Finlay wrote: "[F]or the record . . . I do not want anything to happen to [Marston]. . . . He does good work when he comes. . . I have said this over and over again." (Id.).

The AP investigation resulted in both Baker and Marston receiving a four-day unpaid suspension, and both were required to attend additional training on discrimination and harassment. (Doc. 50-1 at 43; Doc. 50-10 at 14). Both employees grieved the suspensions and received backpay, but the suspensions stayed on their records. (Doc. 50-10 at 14, 22).

### 8. Marston files his First EEOC Charge

On August 9, 2023, while the AP investigation was ongoing, Marston filed an EEOC Charge. (Doc. 30-1). Marston alleged that Lyons was a less-tolerant supervisor than Patterson. (Id. at 2). Marston also explained that he "experienced increased harassment and discrimination based on [his] disability" after Finlay took over for Lyons around July of 2022. (Id.). Marston wrote that his co-workers stated things like "are you choking on a dick?" when he experienced tics and that his co-workers called him a "f***ing retard." (Id.). Marston explained that his co-workers seemed upset about his use of FMLA leave. (Id.). Marston also stated that Finlay treated him differently and made his job harder. (Id.). As an example, Marston stated that he "believed [Finlay]

deliberately gave [him] a poorly-running machine . . . and then deliberately kept [him] from getting and using a different, un-assigned machine in the shop after [his] broke." (Id.).

### 9. Marston's interactions with co-workers after his suspension

Shortly before Marston was suspended, he began recording interactions and taking notes. (Doc. 50-1 at 46). Marston was unable to record specific instances of harassment. (Id.). After his suspension, Marston stopped going to morning meetings and did not really go around his co-workers. (Id.). Marston does not recall specific harassment from co-workers after they reported him to HR, and Marston recalls Finlay becoming more friendly. (Id. at 71–72). However, Marston's co-workers would not let him park in the bay anymore. (Id. at 46).

### 10. Marston requests an accommodation for additional leave beyond FMLA

In August of 2023, Marston exhausted his FMLA leave, and he requested an accommodation of additional leave. (Doc. 50-19). Marston requested up to fifteen days of leave per month. Bellsouth determined that fifteen days of leave per month was not reasonable because this many absences would only have Marston working about five days per month. (Id. at 13–14).

On October 4, 2023, Bellsouth granted Marston an accommodation, which permitted Marston to take an additional thirty-two hours of leave per month beyond his FMLA leave: twenty-four hours of intermittent leave plus eight hours per month for doctor visits. (Doc. 50-10 at 14). Bellsouth also excused any absences that Marston accrued while his accommodation request was pending. (Doc. 50-19 at 24). Marston does not remember receiving discipline for attendance after he received his accommodation. (Doc. 50-1 at 51). Marston "believe[s]" that he received one counseling on attendance, but he is "not sure" if it was just a verbal warning or when it occurred. (Id.). Finlay told Marston that Nick Brown would not approve another accommodation because "it would not do well for the business unit." (Doc. 50-10 at 20).

In 2024, Marston began using his FMLA leave again. (Doc. 50-1 at 53). On April 23, 2024, Marston filed this lawsuit. (Doc. 1). Around the fall of 2024, Marston attended a union picketing event outside company property. (Id. at 48). While on the picket line, another union member (Dominic) and Marston were "joking with" each other. (Id.). Dominic smacked Marston in the head after Marston called him a "pussy." (Id.). Marston and Dominic were not on the clock when the incident happened, and Marston reported the incident to the union president. (Id.).

### 11. Marston resigns and files Second EEOC Charge

On September 30, 2024, Marston resigned. (Doc. 50-21). Marston's resignation notice explained that his "conditions at work have become so difficult that a reasonable person would quit." (Id. at 2). In the weeks before his resignation, Marston only worked a handful of days. (Doc. 50-1 at 59). Marston does not remember any harassment during this time. (Id.). On November 13, 2024, Bellsouth sent Marston a letter offering Marston to return to his employment as if there was no break in his employment. (Doc. 50-22). The offer stated that Marston could begin the following week and explained multiple ways Marston could report any concerns. (Id.). Marston never responded.

On December 5, 2024, Marston filed a second EEOC Charge. (Doc. 30-3). The charge alleged that Marston faced a hostile work environment based on his disability, that Bellsouth would not accommodate him, and that Bellsouth retaliated against him for using leave. (Id.).

### II.    Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome" of the case. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986). If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a genuine dispute of material fact exists. Id.

The party moving for summary judgment "bears the initial burden of demonstrating the absence of a genuine dispute of material fact." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). The movant meets this burden by identifying affirmative evidence (pleadings, depositions, answers to interrogatories, admissions on file, etc.) to support its claim that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1)(A). If the nonmovant bears the burden of persuasion at trial, the movant may also make a prima facie showing of summary judgment by demonstrating that the nonmovant's evidence is insufficient to establish an essential element of its claim. Grange Mut. Cas. Co. v. Slaughter, 958 F.3d 1050, 1057 (11th Cir. 2020); Fed. R. Civ. P. 56(c)(1)(B).

If the movant meets its burden under Rule 56(c), summary judgment will be granted unless the nonmovant offers some competent evidence that could be presented at trial showing that there is a genuine dispute of material fact. Celotex, 477 U.S. at 324. If the movant met its burden by pointing "to specific portions of the record . . . to demonstrate that the nonmoving party cannot meet its burden of proof at trial," the nonmovant must "go beyond the pleadings" to designate specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(e).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson, 477 U.S. at 248. Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat, 658 F.3d at 1307. Thus, summary judgment is only proper when a movant shows that no reasonable jury could find for the nonmovant—even when the evidence and inferences are drawn in the nonmovant's favor.

### III.    Analysis

Marston alleges eight causes of action: (1) failure to accommodate under the Americans with Disabilities Act ("ADA"); (2) hostile work environment under the ADA; (3) retaliatory hostile work environment under the ADA; (4) retaliation under the ADA; (5) retaliation under the Family and Medical Leave Act ("FMLA"); (6) interference under the FMLA; (7) interference under the ADA; and (8) constructive discharge. (Doc. 30). Bellsouth moves for summary judgment as to all counts.

As a preliminary matter, Marston argues that his claims should proceed to a jury even if he cannot demonstrate a prima facie case and that Bellsouth "has tried to force [him] into an inapplicable, likely obsolete evidentiary framework." (Doc. 56 at 17). The framework Marston refers to is the McDonnell Douglas burden-shifting framework. In support, Marston cites a recent Eleventh Circuit opinion that clarifies what the McDonnell Douglas framework does and "what it *does not* do." Ismael v. Roundtree, 161 F.4th 752, 759 (11th Cir. 2025). But that same opinion explains that the framework is applicable to analyzing "[e]mployment discrimination and retaliation cases" at the summary-judgment stage. Id. ("The McDonnell Douglas framework is canonical."). Marston alleges two retaliation claims, so the McDonnel Douglas framework is applicable to those claims. However, the Court knows that this framework is not "the *sine qua non*." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). This means that even where the McDonnell Douglas framework is applicable, it is not the only avenue for Marston to survive summary judgment.

### A.    Failure to accommodate under the ADA

Marston's first cause of action alleges failure to accommodate under the ADA. "An employee making a discrimination claim under the ADA must first exhaust her administrative

remedies by filing a Charge of Discrimination with the EEOC." <u>Batson v. Salvation Army</u>, 897 F.3d 1320, 1327 (11th Cir. 2018). Bellsouth argues that "Marston's failure to accommodate claim is administratively barred because he failed to timely file an EEOC Charge alleging such a claim." (Doc. 51 at 28). In support, Bellsouth explains that "[t]o litigate an ADA claim, 'a plaintiff must first exhaust his administrative remedies, beginning with the filing of a charge of discrimination with the EEOC.'" (<u>Id.</u>) (quoting <u>Rizo v. Alabama Dep't of Hum. Res.</u>, 228 F. App'x 832, 835 (11th Cir. 2007)). Bellsouth also outlines the undisputed facts supporting its argument. Martson's response concedes that his ADA "accommodation claim was not exhausted at the EEOC." (Doc. 56 at 15 n.2). Therefore, Bellsouth is entitled to summary judgment on this claim.

### B.    Hostile work environment under the ADA

Marston's second cause of action alleges hostile work environment under the ADA. "The Eleventh Circuit has previously assumed, albeit in an unpublished opinion, that harassment is a viable claim under the ADA because it is viable under Title VII and the statutes use identical language." <u>Jones v. City of Birmingham</u>, 804 F. Supp. 3d 1232 (N.D. Ala. 2025) (citing <u>Stewart v. Jones Util. & Contracting Co. Inc.</u>, 806 F. App'x 738, 740–41 (11th Cir. 2020)). Because the Eleventh Circuit "analyze[s] ADA-discrimination claims under the same framework as Title VII," <u>Todd v. Fayette Cnty. Sch. Dist.</u>, 998 F.3d 1203, 1215 n.7 (11th Cir. 2021), the Court will apply the Title VII standard for hostile work environment claims to ADA claims.

To prevail on his hostile-work-environment claim Marston must prove the following elements:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is

14

responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). Bellsouth argues that Marson cannot establish his hostile work environment claim because "Marston did not experience unwelcome harassment" and because "Marston cannot establish a basis for holding Bellsouth liable." (Doc. 51 at 12, 14). Marston argues that his "evidence satisfies the prima facie case and evidences pretext—though it is not necessary he do so." (Doc. 56 at 18).

For clarification, the McDonnell Douglas framework is not expressly applicable to hostile-work-environment claims in the Eleventh Circuit. "Technically, the standards applicable to . . . employment-discrimination and hostile-work-environment claims are different." Harris v. Pub. Health Tr. of Miami-Dade Cnty., 82 F.4th 1296, 1304 n.5 (11th Cir. 2023). "For whatever reason, [the Eleventh Circuit has not] applied the three traditional frameworks—direct evidence, McDonnell Douglas, and 'convincing mosaic'—to hostile-work-environment claims." Id. This means that there is no burden-shifting or pretext requirement. To survive summary judgment, Marston must demonstrate that a reasonable jury—viewing facts and inferences in the light most favorable to him—could find that each of the required elements are met.

**1. Marston cannot show that the alleged harassment was unwelcome.**

"[T]he question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 68 (1986) (explaining that "the correct inquiry" for determining whether actionable sexual harassment occurred is whether the plaintiff's "conduct indicated that the alleged sexual advances were unwelcome"). Here, Bellsouth argues that Marston (1) was an active participant in the alleged harassment, (2) failed to express that the conduct was unwelcome, and (3) chose not to report anything. (Doc. 57 at 3). Bellsouth states:

A plaintiff's participation in the alleged conduct, failure to report, or failure to clearly articulate the conduct is unwelcome . . . can be fatal to [a] plaintiff's claim. See Balletti v. Sun-Sentinel Co., 909 F. Supp. 1539, 1548 (S.D. Fla. 1995) (holding plaintiff's participation in sexual banter and belated reporting was 'fatal to her claims' because she could not clearly show that she clearly made her co-workers aware that the conduct was unwelcome); Coyle v. Dakko Prop. Mgmt., Inc., No. CV-07-RRA-00583-S, 2009 WL 10687801, at *18 (N.D. Ala. Oct. 1, 2009) (holding plaintiff did not subjectively perceive harassment as offensive after she did not timely report alleged harassment and continued to engage with alleged harasser); Simmons v. Mobile Infirmary Med. Ctr., 391 F. Supp. 2d 1124, 1134 (S.D. Ala. 2005) (holding plaintiff failed to present evidence she perceived alleged harassing conduct as offensive at the time when she did not report or otherwise protest it).

(Doc. 50 at 12–13). Bellsouth cites several portions of Marston's deposition where he allegedly: "admitted to using the term 'retarded' with his co-workers;" "mocked the extra EEO training as 'fucking dumb;'" "testified if his co-workers messed with him he would 'give it right back;'" "admitted he and his co-workers would 'give each other crap sometimes;'" "admitted that he made inappropriate comments and gestures to his co-workers including using the n-word;" admitted that he would mess with his co-workers if they missed work; admitted that he responded to co-worker's "alleged harassment by laughing under his breath" and admitted that he "does not remember if he told his co-workers to stop." (Doc. 51 at 13) (citing Doc. 50-1 passim). In response, Marston argues that Bellsouth "misconstrues the evidence and draws inferences in [Bellsouth's] favor." (Doc. 56 at 19).

When assessing a summary judgment motion, the court's function is not to make "credibility determinations" and "weigh the evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011). In this posture, some of Bellsouth's stated evidence fails to show that Marston was an active participant in the alleged harassment. For

example, Marston testified that he used the term "retarded" with his co-workers but stated that he "referred to the situation as retarded." (Doc. 50-1 at 67). Marston testified that he was referring to the "way AT&T handled" the situation when he referred to the EEO training as dumb. (Id. at 64). And Marston testified that did not think his co-workers conduct was funny when he laughed under his breath. (Id. at 62).

However, some of Bellsouth's cited evidence shows that Marston was an active participant in workplace harassment. For example, Marston testified that he "would give it right back" to his co-workers when they "manhandled him and stuff." (Doc. 50-1 at 36). This comment came after Marston admitted that he would physically "poke at" his co-workers. (Id.). Marston also testified that he told his co-workers that he would "kick [their] ass" and that he would "hit [them] in their sphincter." (Id.). Marston explained that these statements were "a running joke told between" him and his co-workers. (Id.). Marston also admitted to making extremely lewd comments to a co-worker about the co-worker's wife. (Id. at 36, 43).

Even more, Marston's own statements indicate that he failed to express that the alleged harassment was unwelcome. Regarding the alleged harassment of co-workers for missing work, Marston admitted to "[b]eing sarcastic" with his co-workers for missing work "because that's what they did to [him]." (Doc. 50-1 at 67). Marston considered his own statement that he would hit his co-workers in their "sphincter" to be "a running joke." (Id. at 36). According to Marston, harassing co-workers for missing work and threating physical contact was sarcasm and a running joke.

Finally, Marston's delay in reporting the alleged harassment indicates that the alleged harassment was not unwelcome. To note, Marston's delay in reporting the alleged harassment is not subject to credibility determinations. It is undisputed that Marston did not report his co-workers until *after* his co-workers reported him for inappropriate behavior. In fact, Marston admitted to

saying that it was "an unsaid biblical scripture that you don't fucking go to HR." (Doc. 50-1 at 67). Marston's response points out that "an employee's failure to report harassment is not dispositive of whether the employee perceived the environment created by the harassment as hostile or abusive." Smelter v. S. Home Care Servs. Inc., 904 F.3d 1276, 1285 (11th Cir. 2018). This is true. But Marston did not just delay in reporting the alleged harassment. Marston actively participated in it, and Marston failed to express that the alleged harassment was unwelcome. Therefore, Marston cannot show that the alleged harassment was unwelcome.

### 2. Even if Marston could show the alleged harassment was unwelcome, he cannot show that Bellsouth is liable for the alleged harassment.

A plaintiff has the burden of proving "that the employer is responsible for [the hostile work] environment under either a theory of vicarious or of direct liability." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). "[A]n employer's direct liability can be established through evidence of two types of notice: actual and constructive." Smelter v. S. Home Care Servs. Inc., 904 F.3d 1276, 1287 (11th Cir. 2018). "Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it." Miller, 277 F.3d at 1278. But an employer can avoid liability for hostile-work-environment claims under the Faragher–Ellerth defense. Faragher v. City of Boca Raton, 524 U.S. 775, 778 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). Here, Marston argues that Bellsouth had actual—or at the very least constructive—notice of the alleged harassment based on statements Marston made about Lyons and Finlay. Bellsouth dismisses much of Marston's evidence in support of his actual-knowledge argument as inadmissible hearsay. And Bellsouth disputes Marston's constructive knowledge argument as based on unsupported speculation.

18

Whether Bellsouth had actual or constructive notice of the alleged harassment is irrelevant, however, because Bellsouth establishes the Faragher–Ellerth defense with undisputed evidence.[6] An employer avoids liability under the Faragher–Ellerth defense if: (1) it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior;" and (2) the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765. "Because it is an affirmative defense, the employer bears the burden of establishing both of these elements." Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1303 (11th Cir. 2007).[7]

> **i.    Bellsouth shows that it exercised reasonable care to prevent and correct promptly any harassing behavior.**

Under the first element of the Faragher–Ellerth defense, Bellsouth must show that it "exercised reasonable care to prevent and correct promptly any . . . harassing behavior." Ellerth, 524 U.S. at 765. This element has two parts: (1) reasonable care to prevent and (2) correct promptly. To satisfy the first part, "an employer does not always have to show that it has a formal . . . harassment policy," but mere proof that an anti-harassment policy exists "does not automatically

---

[6] In response to Bellsouth's Faragher–Ellerth argument, Marston also repeats his argument that Bellsouth had actual notice through Lyons and Finlay and constructive notice because the harassment was so frequent and widespread. (Id.). But Eleventh Circuit has explained, and repeated, that if the plaintiff did not want the harassing behavior reported, then the employer would not have been place on proper notice. Olson v. Lowe's Home Ctrs., Inc., 130 F. App'x. 380, 391 n.21 (11th Cir. 2005); Nurse "BE" v. Columbia Palms W. Hosp. Ltd. P'ship, 490 F.3d 1302, 1310 (11th Cir. 2007). Here, Marston explained that he did not report the alleged harassment until after his co-workers reported him because he is "not that type of guy." (Doc. 50-14 at 4).

[7] This "defense is not available where the discrimination the employee has suffered included a tangible employment action" (e.g., "a pay decrease, demotion or termination"). Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1303, 1300 (11th Cir. 2007). Here, Marston does not contend that the defense is inapplicable because he suffered a tangible employment action. Still, the Court must be satisfied that the affirmative defense is available. For example, the defense would likely be inapplicable if Marston was constructively discharged. See Nurse "BE", 490 F.3d at 1308. But no reasonable jury could conclude that Marston was constructively discharged. See infra. Thus, the Court is satisfied that the defense is applicable.

satisfy its burden." <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1313–14 (11th Cir. 2001); <u>see also</u> <u>Ellerth</u>, 524 U.S. at 765 ("While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense."). To satisfy the second part, "an employer need not act instantaneously, but must act in a reasonably prompt manner to respond to the employee's complaint." <u>Frederick</u>, 246 F.3d at 1314.

On the first part, Bellsouth argues that it exercised reasonable care to prevent the alleged harassment because "Marston admitted he reviewed Bellsouth's anti-harassment policies and received anti-harassment training." (Doc. 51 at 16). Marston's response does not dispute that he reviewed Bellsouth's anti-harassment policy and that he received anti-harassment training. Instead, Marston argues that the policy "was entirely ineffective in preventing harassment—so much so, in fact, that employees were effectively threatening Marston about what might happen if he went to HR." (Doc. 56 at 23) (citing Doc. 50-1 at 66).

Marston's only evidence in support of his argument that the policy was ineffective is his own statement that his co-workers threatened him if he went to HR. (Doc. 56 at 23). This evidence is insufficient to prevent a successful <u>Faragher–Ellerth</u> defense because "[e]very employee could say . . . that she did not report the harassment earlier for fear of losing her job or damaging her career prospects." <u>Baldwin</u>, 480 F.3d at 1307. The "Supreme Court undoubtedly realized as much when it designed the <u>Faragher–Ellerth</u> defense, but it nonetheless decided to require an employee to make the choice in favor of ending harassment if she wanted to impose vicarious liability on her employer." <u>Id.</u> "Were it otherwise, the <u>Faragher–Ellerth</u> defense would be largely optional with

plaintiffs, and it would be essentially useless in furthering the important public policy of preventing . . . harassment." Id.

Effectively, Marston fails to point out any inherent defect in Bellsouth's anti-harassment policies and training. And Marston does not dispute that he reviewed Bellsouth's anti-harassment policies and received anti-harassment training. Therefore, Bellsouth shows that it took reasonable care to prevent harassment. Madray v. Publix Supermarkets, Inc., 208 F.3d 1290, 1299 (11th Cir. 2000) ("Therefore, because we find no inherent defect in the complaint procedures established by Publix's sexual harassment policy, nor any evidence that the policy was administered in bad faith, we conclude that Publix exercised reasonable care to prevent sexual harassment.").

On the second part, Bellsouth argues that it promptly addressed the alleged harassment because it "conducted two extensive investigations upon learning of Marston's belated complaints," and "Marston told the asset protection investigator that the harassment had ceased as of August 7, 2023." (Id.). Bellsouth contends that "Marston never reported any further issues" and that Bellsouth "took additional remedial measures to prevent the conduct from recurring." (Id.). In response, Marston argues that he "availed himself of the process by going to HR, HR did not resolve the harassment; and after his complaint he still faced slurs and assaults." (Doc. 56 at 24) (citing Doc. 50-1 at 48, 75).

Marston does not dispute (1) that Bellsouth conducted two investigations based on his complaint, (2) that he told the AP investigator that the harassment ceased as of August 7, 2023, (3) that he never reported any further issues, and (4) that Bellsouth took additional remedial measures to prevent the conduct from recurring. Instead, Marston points to two incidents in the record where he allegedly faced slurs and assaults after his harassment complaint. As Bellsouth's reply explains, these incidents do not show that Bellsouth failed to promptly correct the alleged harassment. One

of these incidents (the picketing incident) was wholly unrelated to Marston's disability, occurred outside Bellsouth property while Marston was not on the job, and involved Marston calling the alleged assaulter a "pussy." (Doc. 50-1 at 48). For the other, Marston was unable to provide a date and was unsure if he reported it. (Id. at 75).

   In short, Marston's evidence is inadequate for a reasonable jury to find that Bellsouth's remedy was inadequate. The Eleventh Circuit has "held that even if the process in which an employer arrives at a remedy in the case of alleged sexual harassment is somehow defective, the defense is still available if the remedial result is adequate." Baldwin, 480 F.3d at 1305 ("Title VII is concerned with preventing discrimination, not with perfecting process."). Likewise, a plaintiff cannot expect an employer's correction of alleged ADA harassment to be perfect. See Todd v. Fayette Cnty. Sch. Dist., 998 F.3d 1203, 1215 n.7 (11th Cir. 2021) ("[B]ecause we analyze ADA-discrimination claims under the same framework as Title VII and Age Discrimination in Employment Act (ADEA) discrimination claims, we often cite case law under all three statutes interchangeably."). Here, Bellsouth provided Marston with its anti-harassment policy and training. Marston admitted that the harassment stopped after his co-workers called HR. This admission is reflected in the transcript from Marston's recording of the AP Investigation meeting and Marston's own deposition. (Doc. 50-1 at 39; Doc. 50-15 at 42). Therefore, Bellsouth shows that it exercised reasonable care to prevent and correct promptly any harassing behavior, and Marston's evidence is inadequate for a reasonable jury to find otherwise.

   **ii.    Bellsouth shows that Marston unreasonably failed to take advantage of any preventive or corrective opportunities provided by Bellsouth or to avoid harm otherwise.**

   Under the second element of the Faragher–Ellerth defense, Bellsouth must show that Marston "unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer or to avoid harm otherwise." Ellerth, 524 U.S. at 765. "[W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." Id.

Bellsouth argues that "Marston knew of Bellsouth's reporting policy but chose not to use them until his co-workers complained about him." (Id.). Marston's response fails to address his delay in reporting the alleged harassment. In reply, Bellsouth points out that "Marston fails to address his inexcusable delay" and argues that Marston's eighteen-month delay in reporting harassment "more than satisfies Faragher's requirements." (Doc. 57 at 8, 9). In support, Bellsouth cites an Eleventh Circuit opinion "affirming summary judgment and holding employee unreasonably failed to take advantage of employer's remedial measures when she waited two and a half months to complain." (Doc. 57 at 8) (citing Walton v. Johnson & Johnson Servs., Inc., 347 F.3d 1272, 1289 (11th Cir. 2003)).

Marston unreasonably failed to take advantage of any preventative or corrective opportunities provided by Bellsouth. "[T]he problem of workplace discrimination . . . cannot be [corrected] without the cooperation of the victims." Madray, 208 F.3d at 1302 (quoting Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir. 1999)). The Faragher–Ellerth defense presents "employees who are victims of harassment with a hard choice: assist in the prevention of harassment by promptly reporting it to the employer, or lose the opportunity to successfully prosecute a Title VII claim based on the harassment." Baldwin, at 1307. For example, no reasonable jury could conclude that a group of plaintiffs reasonably availed themselves to preventative or corrective opportunities when the plaintiffs failed to "fully inform the mid-level

managers of the extent of the harassment," failed to "request that the mid-level managers take any action," and "insisted that they would take action themselves." Madray, 208 F.3d at 1302.

Here, Marston failed to fully inform Bellsouth of the extent of the harassment until eighteen months after it occurred. Marston admitted to Rutledge that he had never reported his co-workers' comments and explained that he went directly to them if he had a problem. (Doc. 50-12 at 6). Marston explained to Bedgood that the reason he reported the harassment was because his co-workers reported him. (Doc. 50-14 at 4). Marston told Bedgood that he did not go to management about the harassment because he is "not that type of guy." (Id.). Clearly, Marston failed to assist in the prevention of harassment by promptly reporting alleged harassment to Bellsouth. Therefore, no reasonable jury could conclude that Marston reasonably availed himself to Bellsouth's preventative or corrective opportunities.

In sum, Bellsouth is entitled to summary judgment on Marston's hostile-work-environment claim two reasons. *First*, Marston cannot show that the alleged harassment was unwelcome. *Second*, Marston cannot show that Bellsouth was liable for the alleged hostile work environment.

## C. Retaliation

Marston's fourth and fifth causes of action allege retaliation under the ADA and the FMLA. Retaliation may be proved with direct or circumstantial evidence. See Berry v. Crestwood Healthcare LP, 84 F.4th 1300, 1310 (11th Cir. 2023). Here, Marston alleges circumstantial—not direct—evidence of retaliation. If an employee seeks to prove retaliation with circumstantial evidence, he "must present enough circumstantial evidence to create a genuine issue of material fact about the employer's retaliatory intent." Id.

The Eleventh Circuit "has 'primarily' relied on the McDonnell Douglas framework to evaluate circumstantial-evidence-based employment claims at summary judgment." Yelling v. St.

Vincent's Health Sys., 82 F.4th 1329, 1337 (11th Cir. 2023). Under this framework, a prima facie claim of retaliation requires that the plaintiff show: (1) that he engaged in a statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that he established a causal link between the protected activity and the adverse action. See, e.g., Bryant v. Jones, 575 F.3d 1281, 1307–08 (11th Cir. 2009). Establishing these elements creates a presumption that the adverse action was retaliation. Id. at 1308. "If the plaintiff establishes a prima facie case of retaliation, the burden of production shifts to the defendant to rebut the presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action." Id. If the employer meets this burden, the plaintiff must show that the proffered reasons were pretextual and that the real reason was retaliation. Id. "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1135 (11th Cir. 2020) (en banc).

Apart from the McDonnell Douglas framework, "an employee may prove retaliation with any circumstantial evidence that creates a reasonable inference of retaliatory intent." Berry, 84 F.4th at 1310. This approach is often called a "convincing-mosaic framework." Id. at 1311. "But a 'convincing mosaic' is a metaphor, not a legal test and not a framework." Id. "The legal standard—and the question for the court at summary judgment—is only whether the evidence permits a reasonable factfinder to find that the employer retaliated against the employee." Id.

The Eleventh Circuit has "identified three nonexclusive categories of circumstantial evidence that can raise a reasonable inference of unlawful conduct." Id. First, "evidence of suspicious timing, ambiguous statements, or other information from which unlawful intent may be inferred." Id. Second, "evidence of systematically better treatment of similarly situated employees." Id. Third, "evidence that the employer's justification for its action is pretextual." Id. However, "'a

scintilla of evidence in support of the [employee's] position' is always insufficient." <u>Id.</u> (alteration in original) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986)). "When an employer offers 'abundant and uncontroverted independent evidence' that no retaliation occurred, the employer will be awarded summary judgment." <u>Id.</u> (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148 (2000)).

Before analyzing the ADA and FMLA retaliation claims, a clarification is necessary regarding the requisite causal connection. Marston argues that he "can show a causal relationship between the protected activity and the adverse action where they are not wholly unrelated." (Doc. 56 at 27) (citing <u>McCann v. Tillman</u>, 526 F.3d 1370, 1376 (11th Cir. 2008)). Generally, this is true for proving retaliation at the prima facie stage. <u>See</u> <u>Tolar v. Bradley Arant Boult Commings, LLP</u>, 997 F.3d 1280, 1294 (11th Cir. 2021). But if the defendant has rebutted the prima facie case with a legitimate, nonretaliatory reason, the plaintiff must meet the but-for test. <u>Tolar</u>, 997 F.3d at 1294. And apart from <u>McDonnell Douglas</u>, "a retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation." <u>Yelling</u>, 82 F.4th at 1342. Specifically, but-for causation applies to retaliation claims *under the ADA and the FMLA*. <u>Frazier-White v. Gee</u>, 818 F.3d 1249, 1258 (11th Cir. 2016) (explaining that the "third element" of an ADA retaliation claim "requires a showing of but-for causation"); <u>Lapham v. Walgreen Co.</u>, 88 F.4th 879, 893 (11th Cir. 2023) ("[W]e hold that the proper causation standard for FMLA . . . retaliation claims is but-for causation.").

### 1. Retaliation under the ADA

"The ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA." <u>Frazier-White v. Gee</u>, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing 42 U.S.C. § 12203(a)). To state a prima facie case, Marston must show: (1) that he engaged

in statutorily protected ADA activity; (2) that he suffered an adverse employment action, and (3) that the action was causally related to the protected activity. Id. There is no dispute that Marston exhausted his administrative remedies on his ADA retaliation claim.

On the first element, Marston explains that "[r]equesting a reasonable accommodation for a disability is protected activity under the ADA," and "[u]tilizing medical leave is a protected activity under the FMLA." (Doc. 56 at 25). Seemingly, Marston concludes that his utilization of medical leave under the FMLA constitutes a request for reasonable accommodation under the ADA. (Doc. 56 at 25). Marston cites Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 831 (11th Cir. 2019) in support. Marston also states that Bellsouth "does not dispute Marston requested intermittent leave as an accommodation for his disability during tic episodes." (Doc. 56 at 25). However, Bellsouth's motion for summary judgment argues that Marston "did not request a job accommodation until August 17, 2023." (Doc. 51 at 22). Further, Bellsouth's reply states that "Marston improperly confuses his FMLA and ADA retaliation claims" and argues that "Marston's alleged protected activity for his ADA retaliation claim is requesting an accommodation." (Doc. 57 at 9, 12).

The disputed issue is whether Marston's requests for FMLA leave show a request for reasonable accommodation under the ADA. Marston is correct that retaliation claims under the ADA and the FMLA are "analyzed using substantially the same framework." (Doc. 56 at 24). In other words, the McDonnell Douglas framework and the convincing mosaic metaphor are used to evaluate both claims. Often, these claims are addressed together because they "depend upon the same set of facts." Batson v. Salvation Army, 897 F.3d 1320, 1327 (11th Cir. 2018). But that does not mean that facts that show a prima facie case of FMLA retaliation *necessarily* show a prima facie case of ADA retaliation.

27

Marston fails to show how his utilization of medical leave under the FMLA qualifies as a request for reasonable accommodation under the ADA. In Connelly (the single case Marston cites in support of his proposition), the plaintiff also took medical leave under the FMLA for her disability. Connelly v. WellStar Health Sys., Inc., 758 F. App'x 825, 831 (11th Cir. 2019). Nevertheless, the Eleventh Circuit explained that the plaintiff's ADA retaliation claim failed because the plaintiff "never requested an accommodation." Id. In a different case, the Eleventh Circuit explained that "[t]he leave provisions of the FMLA are 'wholly distinct from the reasonable accommodation obligations of employers covered under the ADA.'" Gilliard v. Georgia Dep't of Corr., 500 F. App'x 860, 864 (11th Cir. 2012) (quoting 29 C.F.R. § 825.702(a)).

Another way to analyze this issue is simply by understanding what an ADA retaliation claim alleges. "The ADA prohibits retaliation against an individual for *opposing an unlawful practice* or *making a charge under the ADA*." Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016) (emphasis added). Here, Marston does not show that he opposed an unlawful practice or made a charge under the ADA when he requested FMLA leave. Therefore, his request for FMLA leave does not qualify as a request for reasonable accommodation under the ADA. [8]

That said, Marston certainly engaged in statutorily protected activity for purposes of an ADA retaliation claim when he requested a reasonable ADA accommodation on August 17, 2023. (Doc. 50-19 at 20). This means that Marston has shown the first element of his prima facie case of ADA retaliation. The next issues are (1) whether Marston suffered materially adverse employment actions and (2) whether those actions were causally related to Marston's request for an ADA

---

[8] Even if Marston's FMLA leave constitutes a request for reasonable accommodation under the ADA, Marston's ADA retaliation claim would not survive summary judgment. As explained, infra, Marston cannot show that Bellsouth took adverse actions against him for taking FMLA leave, and Marston cannot show causation between the alleged adverse actions and his FMLA leave.

accommodation. These issues are resolved easily because each of Marston's alleged adverse actions occurred before his ADA protected activity in August 2023 (*i.e.*, write-ups from April 2022 and January 2023, Zahn taken away and job assignments in summer 2022, and alleged co-worker harassment that stopped when they reported Marston to HR in May 2023). "[I]f the alleged retaliatory conduct occurred *before* the employee engaged in protected activity, the two events cannot be causally connected." Debe v. State Farm Mut. Auto. Ins. Co., 860 F. App'x 637, 640 (11th Cir. 2021). Therefore, no reasonable jury could conclude that Marston suffered adverse employment actions that were causally connected to his request for an ADA accommodation.

Marston's ADA retaliation claim also fails under the convincing mosaic metaphor. "[A] retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation." Yelling v. St. Vincent's Health Sys., 82 F.4th 1329, 1342 (11th Cir. 2023). No reasonable jury could infer that Marston was retaliated against for requesting an ADA accommodation. Therefore, Bellsouth is entitled to summary judgment on Marston's ADA retaliation claim.

### 2. Retaliation under the FMLA

"The retaliation provision of the FMLA provides that '[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual *for* opposing any practice made unlawful by this subchapter.'" Lapham v. Walgreen Co., 88 F.4th 879, 890 (11th Cir. 2023) (quoting 29 U.S.C. § 2615(a)(2)). "To succeed on this claim, [Marston] must demonstrate that [Bellsouth] 'intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right.'" Jones v. Gulf Coast Health Care of Delaware, LLC, 854 F.3d 1261, 1270 (11th Cir. 2017) (quoting Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1207 (11th Cir. 2001)). To state a prima facie case, Marston must

show: (1) that he engaged in statutorily protected FMLA activity; (2) that he suffered an adverse employment action, and (3) that the action was causally related to the protected activity. Id.

There is no dispute that Marston engaged in statutorily protected FMLA activity by utilizing medical leave under the FMLA. The record shows that Marston was approved for continuous leave from April 22, 2022, to July 14, 2022. (Doc. 50-7). Marston took this FMLA leave and returned to work on June 20, 2022. (Doc. 50-8). The only issues concerning Marston's prima facie case are whether he suffered adverse employment actions and whether those actions were causally related to the protected activity.

On the adverse-employment-action element, the parties appear to disagree on the proper standard. For clarification, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). In the context of a retaliation claim, a plaintiff must show that the alleged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (citation modified). The alleged action must show "*material* adversity because . . . it is important to separate significant [harms] from trivial harms" like "petty slights, minor annoyances, and simple lack of good manners." Id. A plaintiff must show that a "*reasonable* employee" might well have been dissuaded from taking protected action because the "standard for judging harm must be objective." Id.

Marston argues that he faced actionable retaliation in the following ways. *First*, "BellSouth employees consistently ridiculed and bullied Marston. His supervisor admitted they were doing it because they didn't like he was out on leave." (Doc. 56 at 26). Marston argues this "bullying" was material because it "rose to such an extreme level that Marston sat in the car instead of the picnic bench," and the "stress caused his tics to become worse, which necessitated more leave." (Id.).

30

*Second*, "[w]hen [Marston] returned from his disability leave, his ditch-digging machine, a Zahn, was gone," and he "had to work with a bulkier, walk-beside machine (the Zahn was operated by riding it instead)." (Id.). *Third*, [w]hen returning to work from intermittent leave, Finlay assigned him more difficult and laborious jobs, like hand chops and bores." *Fourth*, "Marston also began receiving writeups for safety violations that his coworkers were engaging in." (Id.). As examples, Marston alleges that "he was given a coaching for not wearing his safety glasses" on November 14, 2022, and Marston alleges that he "was written up for not wearing his safety glasses despite the fact that they were on his head, and another coworker, Trevor Baker, did not have on any of his safety equipment except his glasses" on January 3, 2023. (Id. at 26–27). Marston adds that "Baker was never disciplined for his safety violations." (Id. at 27). *Fifth*, Marston explains that he "was suspended." (Id.).[9] In sum, Marston argues that "[t]his conduct, especially when viewed in its entirety, meets the 'might have dissuaded' threshold for retaliatory adverse actions." (Id.).

Bellsouth argues that Marston fails to present evidence of FMLA retaliation. *First*, Bellsouth contends that Marston's focus on alleged harassment as adverse employment action for his retaliation claim relates to his retaliatory-hostile-work-environment claim under the ADA and that there is no such claim under the FMLA. (Doc. 57 at 9). *Second*, Bellsouth argues that "Marston has presented no evidence that either machine made his job objectively harder." (Id.). Bellsouth argues that Marston admitted that "he does not know what happened to the [Zahn] machine during the months he was out on FMLA leave and that the only [Zahn] machine of which he was aware was broken and at another yard." (Id.). Bellsouth disputes Marston's speculation that the Zahn machine was taken away to toy with him and points to Lyons's and Finlay's depositions where

---

[9] Based on the record cited to support this proposition, the Court presumes Marston is referring to his suspension on January 10, 2023, for not wearing his safety glasses. (Doc. 50-1 at 31).

they state that they did not take Marston's machine. (Id. at 11). *Third*, Bellsouth points out that Marston admitted that Finlay gave everyone bores and that the employees with higher seniority got the "easiest jobs." (Id. at 10). *Fourth*, Bellsouth contends that Marston's statement that Lyons began writing him up after Marston took FMLA leave is not supported by the evidence because the "two write-ups from Lyons were prior to Marston requesting leave." (Id. at 11 n.5). Bellsouth points to evidence that Lyons encouraged Marston to seek FMLA leave when he had to write Marston up for attendance in April 2022. (Id.). *Fifth*, regarding Marston's suspension for not wearing his safety glasses, Bellsouth asserts that "[i]t is undisputed that Marston was not wearing his safety glasses and had been coached five times before he was finally written up." (Id. at 11).

Marston's evidence of alleged FMLA retaliation fails to meet the standard for actionable retaliation. To start, Marston fails to show how the alleged bullying from co-workers constitutes adverse action to support a retaliation claim against his *employer*. According to Finlay's testimony, Marston's co-workers came to Finlay and made claims about Marston not being at work, and Finlay explained to them that Scott was taking FMLA leave for a real issue. (Doc. 50-1 at 12). But no evidence shows that Marston's supervisors attempted to dissuade him from taking FMLA leave. In fact, the evidence shows that they encouraged him to take FMLA leave. (Doc. 50-6 at 12) ("I encouraged him to apply for FMLA."). As a reminder, the FMLA prohibits *employers* from retaliating against employees for exercising their FMLA rights. Lapham, 88 F.4th at 890. Therefore, the alleged harassment from co-workers fails to show adverse actions by Bellsouth.

Next, Marston's arguments that Bellsouth made his work harder when returning from FMLA leave fail to satisfy the objective standard for material adversity. Marston considers the machine he had to work with when his Zahn was gone "bulkier" and states that it was a "walk-beside machine." (Doc. 56 at 26). But "Marston has presented no evidence that either machine

made his job objectively harder." (Doc. 57 at 9). Finlay testified that neither machine is easy. (Doc. 50-10 at 18). Marston admitted that other employees did not have the Zahn machine at this time and that Bellsouth and Finlay "would always give" co-workers with "seniority" the "easiest jobs." (Doc. 50-1 at 68).

Finally, Marston fails to show how his safety write-ups and suspension were actionable retaliation. Marston sets forth no evidence showing that a reasonable employee would been dissuaded from taking FMLA leave after being written up for a safety violation. Marston's arguments are (1) that the write-ups occurred in proximity with his FMLA leave and (2) that other employees did not get written up. But Marston was written up before and after his leave. Marston does not dispute that he was violating safety protocol when he was written up and suspended. And Marston admits that his co-workers got "written up sometimes." (Doc. 50-1 at 69). Taken together, these allegations are no more than "petty slights or minor annoyances that often take place at work and that all employees experience." <u>Burlington</u>, 548 U.S. at 68.

Even if any of these alleged adverse actions were actionable, Marston fails to show the requisite causal connection. Marston argues that he "can show the causal connection because his supervisor admitted the coworker harassment was because they were mad he was taking leave." (Doc. 56 at 27). Marston also argues that he "can rely on the close proximity of his protected activity and the retaliation." (<u>Id.</u>). This includes "the writeups he received, the machine being denied to him, and the assignment of more difficult tasks when he returned to leave." (<u>Id.</u>). Bellsouth disputes causation on each group of evidence.

Marston's reliance on proximity is insufficient to show causation on the safety write-up and harassment allegations. The Eleventh Circuit has "h[e]ld that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected

activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation." Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006). Here, Marston's own arguments weaken his claims that the alleged adverse actions were causally related to his FMLA leave. For example, Marston argues that Lyons began targeting Marston before Marston took FMLA leave. (Doc. 56 at 6). Moreover, Marston argues that he faced harassment for his disability before he started taking FMLA leave. (Doc. 56 at 7).[10] It is undisputed that Bellsouth was taking the same action (safety write-ups), and Marston was facing the alleged harassment, before Marston engaged in protected activity.

The "more difficult work" and "denied machine" allegations occurred after Marston took FMLA leave. However, "mere temporal proximity, without more, must be very close." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). Furthermore, Bellsouth offers legitimate, nonretaliatory reasons for these allegations. The Zahn machine was under repair at the Mobile yard, and Marston's supervisors gave easier jobs to those with seniority. (Doc. 57 at 11). Because Bellsouth offers a legitimate, nonretaliatory reason for the alleged harder work and denied machine, Marston must show but-for causation. See Tolar, 997 F.3d at 1294. Marston's only evidence in support of causation on these allegations is that another co-worker answered "probably" when Marston asked the co-worker if he thought Lyons took away to machine "to fuck with [Marston]." (Doc. 50-1 at 20). But Marston admits that his supervisors gave easier jobs to those with seniority. (Id. at 68). Marston admits that another employee at his yard also did not have a Zahn during this time. (Id. at 19). And Marston admits that the two employees who had a Zahn

---

[10] Again, Marston fails to show that the alleged harassment was an adverse action taken by his *employer*. To the extent that the alleged harassment involved Marston's use of FMLA leave, Finlay recalled telling the Marston's co-workers that the FMLA leave was legal and excused. (Doc. 50-10 at 12). And Lyons recalled encouraging Marston to take FMLA leave. (Doc. 50-6 at 12).

during this time had been at Bellsouth longer than him. (Id.). Therefore, Marston cannot show that he would not have been given more difficult work or denied the Zahn machine but for his utilization of FMLA leave.

Considering Marston's evidence in its totality and in the light most favorable to Marston, no reasonable jury could find for Marston on his FMLA retaliation claim. Marston fails to show that Bellsouth engaged in adverse actions of retaliation related to his taking of FMLA leave. Further, Marston fails to show the requisite causation for an FMLA retaliation claim. As a result, no reasonable jury could determine that Marston was retaliated against for taking his FMLA leave. In other words, Marston fails to make a prima facie case of retaliation, and Marston's evidence is insufficient to show a convincing mosaic of FMLA retaliation. See Yelling, 82 F.4th at 1342 ("[A] retaliation plaintiff's 'mosaic' of evidence must still be enough to allow a reasonable jury to infer but-for causation."). Thus, Bellsouth is entitled to summary judgment on Marston's FMLA retaliation claim.

### D.    Retaliatory hostile work environment under the ADA

Marston's third cause of action alleges retaliatory hostile work environment under the ADA. "A retaliatory-hostile-work-environment claim complains that the employer created or tolerated a hostile work environment in retaliation for an employee's participation in protected activity." Buckley v. Sec'y of Army, 97 F.4th 784, 799 (11th Cir. 2024). "So a retaliatory-hostile-work-environment claim is somewhat of a hybrid of a traditional protected-characteristic-based hostile-work-environment claim and a traditional retaliation claim." Id. The nature of this claim presents several preliminary questions that neither party discusses.

The first issue is whether the Eleventh Circuit even recognizes retaliatory-hostile-work-environment claims *under the ADA*. "The Eleventh Circuit has never, in a published opinion,

recognized a cause of action for a retaliatory hostile work environment under the ADA." Shaling v. UPS Ground Freight, 202 F. Supp. 3d 1283, 1290 (N.D. Ala. 2016). Even in December of 2025, the Eleventh Circuit repeated this statement. See Mullin v. Sec'y, U.S. Dep't of Veterans Affs., 162 F.4th 1296, 1315 (11th Cir. 2025) ("[W]e have not opined on whether a retaliatory hostile work environment claim can be properly asserted under the . . . ADA."). However, the Eleventh Circuit has recognized retaliatory-hostile-work-environment claims under Title VII. See, e.g., Monaghan v. Worldpay US, Inc., 955 F.3d 855, 860 (11th Cir. 2020). The "anti-retaliation provisions of the ADA and Title VII are nearly identical." Bosarge v. Mobile Area Water & Sewer Serv., No. 20-14298, 2022 WL 203020, at *13 (11th Cir. Jan. 24, 2022). As a result, the Eleventh Circuit—in an unpublished opinion—"assume[d]" that a "retaliatory hostile work environment claim is cognizable under the ADA, and that the same standard applies to that claim as would apply to a similar claim under Title VII." Id. Given the similarities between the ADA and Title VII, this Court will assume that a retaliatory-hostile-work-environment claim under the ADA is cognizable. See Shaling, 202 F. Supp. 3d at 1290 (concluding the same).

The next issue involves determining the proper standard for analyzing a retaliatory-hostile-work-environment claim. The Eleventh Circuit has "recognized that retaliatory-hostile-work-environment claims are 'really . . . retaliation claims . . . rather than . . . "hostile[-work]-environment" claims.'" Buckley, 97 F.4th at 799 (quoting Babb v. Sec'y, Dep't of Veterans Affs., 992 F.3d 1193, 1207 (11th Cir. 2021)). Further, the Eleventh Circuit has expressly stated the difference between actionable harassment for *retaliatory*-hostile-work-environment claims and *substantive*-hostile-work-environment claims. For *substantive*-hostile-work-environment claims, the plaintiff must show "severe or pervasive" harassment. Tonkyro v. Sec'y, Dep't of Veterans Affs., 995 F.3d 828, 835 (11th Cir. 2021). For *retaliatory*-hostile-work-environment claims, the

plaintiff will "prevail if the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Monaghan, 955 F.3d at 862–63); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (explaining that this standard shows "actionable retaliation"). Accordingly, the Eleventh Circuit "appl[ies] the framework for retaliation claims, namely whether [the plaintiff] engaged in protected . . . activity and suffered a hostile work environment because of that activity." Terrell v. Sec'y, Dep't of Veterans Affs., 98 F.4th 1343, 1356 (11th Cir.), cert. denied sub nom. Terrell v. McDonough, 145 S. Ct. 273 (2024). But the Eleventh Circuit "add[s] one additional element: whether the work environment 'might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. (quoting Monaghan, 955 F.3d at 862–63).

To summarize, "[a] retaliatory-hostile-work-environment claim complains that the employer created or tolerated a hostile work environment in retaliation for an employee's participation in protected activity." Buckley, 97 F.4th at 799. The Court assumes this claim is applicable under the ADA. Therefore, Marston must show: (1) that he engaged in protected ADA activity; (2) that he suffered a hostile work environment because of that activity; and (3) that the work environment might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. Terrell, 98 F.4th at 1356.[11]

---

[11] The characterization of a retaliatory-hostile-work-environment claim as "really" a "retaliation" claim, Buckley, 97 F.4th at 799, raises an academic question that has not been squarely addressed. "Technically, the standards applicable to [retaliation] and hostile-work-environment claims are different." Harris v. Pub. Health Tr. of Miami-Dade Cnty., 82 F.4th 1296, 1304 n.5 (11th Cir. 2023). "For whatever reason, [the Eleventh Circuit has not] applied the three traditional frameworks— direct evidence, McDonnell Douglas, and 'convincing mosaic'—to hostile-work-environment claims." Id. But the Eleventh Circuit has affirmed the grant of summary judgment on a retaliatory-hostile-work-environment claim "on the independent ground of causation." Buckley, 97 F.4th at 800. Thus, the Court will apply the single standard that the Eleventh Circuit has articulated for retaliatory hostile work environment. Terrell, 98 F.4th at 1356.

Marston's evidence cannot support a claim for ADA retaliation or ADA hostile work environment. Marston's hybrid claim between the two fails because he cannot show the requisite causation for a retaliatory-hostile-work-environment claim under the ADA. Marston's alleged harassment occurred *before* his August 17, 2023, request for an ADA accommodation. According to Marston, the alleged harassment stopped when his co-workers reported him to HR on May 4, 2023: "They quit all that shit. When they called HR, all that stopped." (Doc. 50-1 at 39; Doc. 50-15 at 42). As a result, Marston cannot show that the harassment was because of his request for an ADA accommodation. Edgerton v. City of Plantation, 682 F. App'x 748, 751 (11th Cir. 2017) (explaining that the plaintiff's identification of "the same harassing behavior as occurring both before and after her complaint" is insufficient to support a retaliatory-hostile-work-environment claim).

In short, Marston cannot satisfy the causation element, which is required for a retaliatory-hostile-work-environment claim. Thus, Bellsouth is entitled to summary judgment on this claim. See Buckley, 97 F.4th at 800 ("[W]e agree with the district court that [the plaintiff's] retaliatory-hostile-work-environment claim fails on the independent ground of causation.").

### E.    Interference under the FMLA

Marston's sixth cause of action alleges interference under the FMLA. "An FMLA interference claim lies if an employee can demonstrate by a preponderance of the evidence that she was entitled to an FMLA benefit and her employer denied her that benefit." Munoz v. Selig Enters., Inc., 981 F.3d 1265, 1274 (11th Cir. 2020). To prevail on his claim, Marston must show (1) that he was entitled to an FMLA benefit, (2) that his employer denied him that benefit, and (3) that he suffered "harm, or prejudice, resulting from the employer's interference with [his] exercise

(or attempted exercise)" of that benefit. Graves v. Brandstar, Inc., 67 F.4th 1117, 1121 (11th Cir. 2023).

Neither party disputes that Marston was entitled to FMLA leave. The issues are (1) whether Bellsouth's alleged delay in approving FMLA leave constitutes a denial and (2) whether the denial, if any, caused Marston harm or prejudice. Marston argues that he was denied FMLA leave on several occasions. Marston argues that he can show that he suffered harm from the denial of leave because "he was required to call in and have his employer correct the classification of the leave." (Doc. 56 at 29–30). Moreover, Marston argues that he either had to come in to work or take leave that was not protected on the days FMLA was denied or misclassified. (Id.).

In reply, Bellsouth explains that "Marston testified that, for days that may have been initially denied, he was able to get all of his FMLA days 'straightened out' once the paperwork came in from his doctor." (Doc. 57 at 12) (citing Doc 50-1 at 53). On this point, Bellsouth argues that a delay in approving FMLA leave does not state an FMLA interference claim. (Id.) (citing Bender v. City of Clearwater, No. 8:04-CV-1929-T23EAJ, 2006 WL 1046944, at *11 (M.D. Fla. Apr. 19, 2006)). Bellsouth also argues that Marston fails to show any prejudice from alleged delays in approving his leave. On this point, Bellsouth notes that "Marston's argument that he was compelled to come to work or take unprotected leave . . . is not supported by the record." (Id.).

The only caselaw cited on this issue suggests that Marston's alleged delays in getting the FMLA approved are insufficient to show a denial of an FMLA right. Bender v. City of Clearwater, No. 8:04-CV-1929-T23EAJ, 2006 WL 1046944, at *11 (M.D. Fla. Apr. 19, 2006) ("Significantly, Plaintiff has not shown that the City's alleged delays in processing and approving her leave resulted in a denial of a right or benefit."). Moreover, Marston fails to show harm or prejudice from these alleged delays. The only evidence Marston provides in support his damages argument is that he

had to call Bellsouth and ask them to correct the classification of his leave. (Doc. 56 at 29–30) (citing Doc. 50-1 at 53). Notably, Marston fails to cite to any evidence in support of his contention that he had to come in to work or take unprotected leave on the days his FMLA leave was denied or misclassified. (Doc. 56 at 30). Even assuming this unsupported contention is true, Marston's evidence does not show that he suffered harm or prejudice under the FMLA. The Eleventh Circuit has clarified that "the FMLA does not allow recovery for mental distress or the loss of job security." Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999). "Even if the defendants have committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages." Id. Ultimately, Marston was granted FMLA leave every time he requested it, and Marston was approved for additional FMLA leave every year he worked at Bellsouth.

In sum, Marston fails to show that Bellsouth's alleged delay in granting his leave constitutes a denial, and Marston fails to show that he suffered harm as a result. Therefore, Bellsouth is entitled to summary judgment on the FMLA interference claim.

### F. Interference under the ADA

Marston's seventh cause of action alleges interference under the ADA. The ADA's anti-interference provision makes it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b). The Eleventh Circuit has "not yet had occasion to explain the proper standard for evaluating an ADA anti-interference claim." Atchison v. Bd. of Regents of Univ. Sys. of Georgia, 802 F. App'x 495, 508 (11th Cir. 2020). However, this Court has previously articulated three elements based on the text of the ADA's anti-interference statute and its similarities to the Fair Housing Act's ("FHA") anti-

interference provisions. See Mosley v. AM/NS Calvert, LLC, No. CV 1:20-00517-KD-M, 2022 WL 843773, at *8–9 (S.D. Ala. Mar. 21, 2022) (relying on FHA anti-interference caselaw).

Under this Court's established standard, the plaintiff must show: (1) that "she exercised a right protected by the ADA;" (2) that the defendant "coerced, intimidated, threatened, and/or interfered with her ADA rights;" and (3) that the defendant's "actions were motivated because she exercised a right protected by the ADA." Mosley, 2022 WL 843773, at *8.[12] Regarding the second element, this Court has explained that the alleged unlawful conduct "need not be a materially adverse employment action" because the interference provision is broader than the standard for retaliation. Id. at *9. Accordingly, this Court has declined to "adopt the reasoning of other Circuits which have analyzed ADA anti-interference claims under the same standard as retaliation claims." Id. at *9 n.7. Still, the alleged unlawful conduct must be "so severe or pervasive that it will have the effect of causing a protected person to abandon the exercise of his or her [ADA] rights." Id. at *9 (quoting FSI Green Park S. Prop., LLC v. City of Pelham, Ala., 2020 WL 4933664, *13 (N.D. Ala. Aug. 24, 2020) (explaining that this standard applies to FHA and ADA interference claims). For example, allegations of an "increased workload," "heightened scrutiny," and "false representations" about a plaintiff's performance fail "to meet the level of severity that would cause a reasonable person to abandon her ADA rights." Id.

Bellsouth argues that Marston's ADA interference claim fails for several reasons. *First*, Bellsouth argues that Marston's ADA interference claim is duplicative of his other ADA claims (failure to accommodate and retaliation). (Doc. 51 at 32). *Second*, Bellsouth argues that Marston

---

[12] Specifically, this test is derived from the Eleventh Circuit's holding in Sofarelli v. Pinellas Cnty., 931 F.2d 718, 721–23 (11th Cir. 1991) regarding interference under the Fair Housing Act. See Atchison v. Bd. of Regents of Univ. Sys. of Georgia, 802 F. App'x 495, 509 (11th Cir. 2020).

failed to timely exhaust his ADA interference claim. (Id.). *Third*, Bellsouth argues that it "went above and beyond to accommodate Marston" and that it "did not interfere with Marston's rights under the ADA." (Id.).

In response, Marston argues that the "evidence in this case clearly establishes that BellSouth employees coerced and threatened Marston for exercising his ADA rights, his supervisors did nothing about it, and he was ultimately harmed by physical assaults, ridicule, increased stress and tics, and ultimately could not safely return to work." (Doc. 56 at 31). Marston also claims that Bellsouth "interfered with his rights by limiting his accommodation leave to set number of dates and telling him another accommodation would not be allowed." (Id.) (citing Doc. 50-1 at 51; Doc. 50-10 at 20). Marston argues that the "determent worked" because he "stopped requesting accommodations" after that. (Id.) (citing Doc. 50-19).

In reply, Bellsouth argues that "Marston has conceded that he did not exhaust his ADA accommodation claim" and that "Marston does not respond to Bellsouth's argument that he similarly failed to exhaust administrative remedies as to his ADA interference claim." (Doc. 57 at 14). Bellsouth also argues that Marston confuses the timeline and alleged interference based on alleged events that occurred before he exercised his ADA rights. (Id.). And Bellsouth contends that "Marston did not need another accommodation because his FMLA hours reset in 2024, and he did not exhaust his leave in 2024." (Id.).

A preliminary issue is whether Marston properly exhausted his ADA interference claim. Again, "[a]n employee making a discrimination claim under the ADA must first exhaust her administrative remedies by filing a Charge of Discrimination with the EEOC." Batson v. Salvation Army, 897 F.3d 1320, 1327 (11th Cir. 2018). Bellsouth argues that Marston failed to exhaust his ADA interference claim because his first EEOC Charge on August 9, 2023, did not mention an

accommodation claim. (Doc. 51 at 32). Bellsouth explains that "Marston requested an accommodation on August 17, 2023, after he exhausted his FMLA leave" and that "Bellsouth granted Marston a reasonable accommodation on October 4, 2023." (Id.). Bellsouth notes that "Marston did not file a second EEOC Charge until December 5, 2024, more than one year later, which makes a passing reference to a denial of accommodation." (Id.). And Bellsouth cites Eleventh Circuit caselaw explaining the exhaustion deadlines for ADA interference claims. (Id.) (citing Callahan v. Emory Healthcare, Inc., No. 23-10604, 2024 WL 3027684, at *6 (11th Cir. June 17, 2024)).

Marston's response concedes that his ADA accommodation claim "was not exhausted at the EEOC." (Doc. 56 at 18 n.2). But Marston's response does not address Bellsouth's assertion that his ADA interference claim was not exhausted. Because Marston fails to respond to Bellsouth's assertion, the Court will "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). "The court has no duty to search the record to identify the facts that might establish or defeat summary judgment." 2 Steven S. Gensler, Federal Rules of Civil Procedure, Rules and Commentary § 56:45 (2025).

To summarize, Bellsouth argues that Marston's ADA interference claim was not exhausted and supports its assertion with evidence in the record and Eleventh Circuit caselaw. Marston— who has already conceded that his ADA accommodation claim was not exhausted—fails to respond to the ADA interference exhaustion argument. Therefore, Bellsouth's exhaustion argument is considered "undisputed for purposes of [this] motion," Fed. R. Civ. P. 56(e)(2), and Bellsouth is entitled to summary judgment on the ADA interference claim.

### F. Constructive Discharge

Marston's eighth cause of action alleges constructive discharge. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job. Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) (quoting Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 244 (4th Cir. 1997)). "A plaintiff must show 'the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign.'" Id. (quoting Virgo v. Riviera Beach Assoc., Ltd., 30 F.3d 1350, 1363 (11th Cir. 1994)). Notably, "[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." Id.

Bellsouth argues that Marston admitted (1) that "his interactions with his co-workers were limited after the HR reports in May 2023" and (2) that Finlay "was nicer to him after he complained." (Doc. 51 at 26). Bellsouth states that "Marston was not written up in 2024 and made no complaints of any alleged harassment or differential treatment after his complaint in 2023." (Id.). Bellsouth contends that the "only incident Marston has alleged led to his constructive discharge was unrelated to his disability or to his job." (Id.). This incident involved another union member allegedly slapping Marston after Marston called him a "pussy" at a picketing event. (Id.). (quoting Doc. 50-1 at 48). Bellsouth argues that "Marston did not work with this person or even at the location he was picketing," that "Marston returned to work in September 2024 after the strike ended," that "Marston did not report the incident to Bellsouth," and that "Marston submitted his resignation a couple of weeks later." (Id.).

Marston argues that he was constructively discharged because he "faced a bevy of demeaning comments about his disability, including those which occurred in the presence of a

supervisor *after* his complaint to HR." (Doc. 56 at 31) (citing Doc. 50-1 at 61, 64). Marston also states that he "faced multiple assaults while working for BellSouth, including the final one, which occurred after he had submitted his EEOC charges and his Complaint." (Id.) (citing Doc. 50-1 at 48). Marston does not deny Bellsouth's assertions that Marston did not work with the alleged assaulter and that Marston did not report the incident to Bellsouth. Instead, Marston argues that the assaulter was a Bellsouth employee and that Marston did report the incident to the Union president. (Id.) (citing Doc. 50-1 at 49). Finally, Marston concedes "that he did not face the same volume of discriminatory comments after his complaint to HR," but Marston argues "a reasonable jury could conclude this was largely because Marston was avoiding the harassment." (Id. at 32).

In reply, Bellsouth argues that "Marston continues to ignore the timeline of events established by the record." (Doc. 57 at 15). Bellsouth asserts that the picketing incident had nothing to do with Marston's disability and therefore, cannot establish his ADA claim for constructive discharge. (Id.) (citing Mosley v. AM/NS Calvert, LLC, No. CV 1:20-00517-KD-M, 2022 WL 703601, at *17 (S.D. Ala. Mar. 8, 2022)). Bellsouth argues that Marston's cited evidence of "a bevy" of alleged harassment is insufficient to prove constructive discharge for several reasons. For example, the remark from page 235 of Marston's deposition occurred more than a year before Marston resigned. (Id.). Further, "Marston did not report any alleged inappropriate comments to HR until after" his co-workers complained against him. (Id.).

Marston's cited evidence fails to show that his constructive discharge claim can survive summary judgment. Much of the cited allegations occurred more than a year before Marston resigned. In fact, Marston admits "that he did not face the same volume of discriminatory comments after his complaint to HR." (Doc. 56 at 32). This weakens Marston's claim that the harassment forced him to resign. Moore v. San Carlos Park Fire Prot. & Rescue, 808 F. App'x 789,

798 (11th Cir. 2020) ("In determining whether a reasonable person would be compelled to resign, courts consider the amount of time between the objectionable acts and the constructive discharge, with a longer gap cutting against reasonableness."). The most-recent alleged harassment involved Marston being physically assaulted after calling another union worker "pussy" at a picketing event. (Id.). (quoting Doc. 50-1 at 48). But Marston does not contest Bellsouth's assertion that this incident "was unrelated to his disability or to his job." (Doc. 51 at 26). And Marston does not dispute that he did not report the incident to Bellsouth. Furthermore, the alleged harassment cited by Marston is in insufficient to survive summary judgment on his *hostile-work-environment claim*. "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir. 2001). Thus, Marston's evidence cannot show constructive discharge.

At bottom, none of Marston's cited evidence shows that Bellsouth deliberately made his working conditions intolerable to force him to quit. Constructive discharge claims require proof that the "*employer* deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Bryant, 575 F.3d at 1298 (emphasis added). Here, Marston simply points to alleged harassment from co-workers and an alleged assault from a fellow union worker at an off-hour picketing event. This evidence fails to show that Bellsouth "intentionally rendered [Marston's] working conditions so intolerable . . . that [he] was compelled to quit involuntarily." Phillips v. Harbor Venice Mgt, LLC, 2020 WL 2735201, *5 (M.D. Fla. May 26, 2020). Accordingly, no reasonable jury could conclude that Marston's evidence establishes his claim of constructive discharge.

IV.    Conclusion

Marston alleges eight causes of action: (1) failure to accommodate under the ADA; (2) hostile work environment under the ADA; (3) retaliatory hostile work environment under the ADA; (4) retaliation under the ADA; (5) retaliation under the FMLA; (6) interference under the FMLA; (7) interference under the ADA; and (8) constructive discharge. Bellsouth moves for summary judgment as to all of Marston's claims. Marston fails to show that a reasonable jury could find for him on any of his claims. Thus, Bellsouth's motion for summary judgment, (Doc. 49), is **GRANTED**.

**DONE** and **ORDERED** this **13th** day of **February 2026**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**